THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. WILLIAM E. CARINI, Defendant-Appellant.

First District (5th Division) No. 85—0741

Opinion filed December 30, 1986.

266

268

James J. Doherty, Public Defender, of Chicago (John Lanahan, Assistant Public Defender, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Thomas V. Gainer, James E. Fitzgerald, and Andrew P. Black, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE SULLIVAN delivered the opinion of the court:

Following a jury trial, defendant was convicted of two counts of concealment of a homicidal death and sentenced to consecutive terms of five years for each count. On appeal, he contends that (1) the trial court erred in denying his motions to suppress (a) evidence relating to the discovery of the bodies and (b) statements he made to the police thereafter, which were obtained in violation of his constitutional rights; (2) the trial court erroneously (a) prevented defense counsel from raising the affirmative defense of compulsion in his opening statement, (b) excluded evidence relating to violent acts committed by and against one of the victims, and (c) gave an improper jury instruction on the definition of compulsion; (3) he was denied a fair trial by certain remarks made by the prosecutors; and (4) the imposition of consecutive sentences was improper.

The charges arose from the discovery by police, on September 3, 1983, of the bodies of Joanne Seaquist, a friend of defendant, and John Kuba, his uncle, in the trunk of Kuba's car in a rental unit of "The Lockup," a self-storage facility in Northbrook, Illinois. Defendant, lessee of the unit, was arrested the following day and charged with concealment of their homicidal deaths.

Prior to trial, defendant filed motions to suppress (a) all evidence

relating to the discovery of the bodies and (b) the statements he made to the police following his arrest.

At the hearing on the motion to suppress the evidence, defendant called as witnesses Cook County sheriff's police officers McHenry and Bettiker, who testified, in substance, that when they arrived at The Lockup in response to a call from the manager, Sigel Roush, they saw a white, 1968 Chevrolet inside unit G-10, the door to which had been opened by Roush prior to their arrival. Evidence technicians entered the unit and, without a search warrant, forced open the locked trunk, inside of which they found the badly decomposed bodies of Kuba and Seaquist. Based upon information from Roush that defendant was the lessee of the unit in which the car was found, a complaint was filed and a warrant issued for his arrest. Following argument by counsel, the trial court denied defendant's motion to suppress the evidence, finding that because he did not own the car he lacked standing to challenge the legality of the warrantless search.

At a separate hearing on defendant's motion to suppress statements he made during custodial interrogation, Officer Bettiker reiterated his testimony regarding the circumstances of the discovery of the bodies on September 3, and further testified that defendant was arrested in Iowa City, Iowa, later that night and interviewed by him and Officer Betz the following afternoon. According to the officers, whose testimony was essentially the same, when defendant, whom they had questioned on prior occasions regarding the whereabouts of Kuba and Seaquist, was brought into the interview room at the Johnson County, Iowa, jail, they informed him that the remains of Kuba and Seaquist had been found and that they wished to speak with him about the case. His *Miranda* rights were read to him from a preprinted form, which he was then given to read. Although he indicated that he understood the warnings, he refused to sign or initial the form acknowledging receipt of them, stating that his attorney had advised him not to sign anything. When asked if he was willing to discuss the case, he replied, "My attorney told me that I shouldn't talk to you," but when the officers inquired whether that meant he did not wish to answer any questions, he replied, "Well, I was told not to talk to you but that doesn't mean I don't want to. You haven't asked me any questions yet. What am I being charged with?" They informed him that he was under arrest for concealing the homicidal deaths of Kuba and Seaquist, and when he denied any knowledge thereabout, they gave him a copy of a statement made by Roush the previous day. At one point while reading it, he commented, "My life is worth more than $98," presumably referring to a comment by Roush that he

thought it strange that someone would pay a monthly storage fee of $98 for a car barely worth that amount. Although he agreed to answer many of their questions, on five to seven occasions he refused, specifying as his reason two or three times that he did not wish to respond to the particular question until he spoke to his attorney. Upon each such refusal, they ceased questioning him and began preparing to leave the room, but every time they did so, defendant reinitiated the conversation, usually by asking a question. While alone with Betz, when Bettiker left to get some coffee, defendant "sobbed a little bit." The interview was terminated approximately 10 minutes after Bettiker's return when defendant stated that he no longer wished to talk to them and asked to be allowed to see his girlfriend. Prior thereto, defendant had not, at any time during the 1½-hour interview, expressed any desire to leave the room or to make any telephone calls.

Defendant testified that Officers Bettiker and Betz had questioned him several times concerning the disappearance of Kuba and Seaquist prior to his arrest and knew that he had consulted with and retained trial counsel as his attorney. He acknowledged that he received and understood the *Miranda* warnings; that he was neither abused nor threatened by either of the interrogating officers; and that he had answered some of their questions. He further testified, however, that although he repeatedly (8 to 10 times) told them that he had been advised by his attorney to remain silent and would not answer any questions without counsel present, they eventually "wore him down" by asking one question after another and causing him to feel he would be kept there until he answered them. Having been awake all night, he was very tired, and also emotionally upset and worried, particularly about his girlfriend—a college student whom he had come to Iowa to visit—and at one point toward the end of the interview, when Officer Bettiker was out of the room, he began to cry. The only questions he asked concerned the reason for his arrest, how long he would be held in Iowa, his girlfriend's welfare, and whether he would be allowed to see her.

On cross-examination, defendant stated that he had received two or three telephone calls and had placed one prior to making any statements in Iowa; that he had been arrested and questioned by the police on past occasions, including once in relation to an aggravated-battery charge of which he was subsequently acquitted; that each time he refused to answer a question posed by the officers, he explained that he would not do so "without my lawyer present"; and that although they occasionally arose from their chairs and moved about the room, at no time did they terminate the interrogation or prepare to leave.

After argument and the presentation of legal memoranda by counsel, the trial court denied defendant's motion to suppress his post-arrest statements, finding that they were voluntarily made after a knowing and intelligent waiver of his constitutional rights.

At trial, Ed Kuba, defendant's uncle and the older brother of John Kuba, testified that defendant and John lived in the Glenview house owned by his deceased father's estate, of which he was the executor. The last time he spoke to his brother was on March 24, 1983, when John, whose hobby was racing cars, called to tell him about a "hot rod" he had recently purchased. On Saturday morning, March 26, he and his wife went to look at the car. As they drove up to the house, they saw John's white, 1968 Chevrolet parked in the driveway, but when asked, defendant stated that John was not home, adding that he had left the house with "a couple of guys" at about 2 o'clock that morning. Upon entering the garage to look at the new car—a red Chevrolet Nova—he noticed numerous auto parts John had purchased for it strewn about the floor and that the engine was running. Defendant explained that he had taken the car for a "little test spin." On March 28 or 29, he asked defendant about certain rumors that he had sold some of the parts for John's new race car. Defendant responded that he did so because John owed him some money. When he and his wife arrived at the Glenview house, at about 8:30 a.m. on Easter Sunday, April 3, defendant met them at the door, fully awake and clothed, and once again stated that he had not yet heard from John. The following day, Monday, April 4, Ed returned to the house while defendant was away to "look around." The 1968 Chevrolet was still in the driveway, and after determining that none of John's other personal possessions or clothing were gone, he called the Cook County sheriff's police to report his brother missing. At the request of the police, who informed him that Joanne Seaquist was also missing, he returned to the house on April 5 or 6 to look for items that might belong to her. Although he did not find any, he did notice what appeared to be dried blood on the garage floor and before leaving, he scraped some of it into a folded paper which he later gave to Officer Peterson of the Vernon Hills police department. He also noticed that the Chevrolet was no longer in the driveway. Defendant later told him that it had been stolen but that he had not reported the theft because it was not his car. A few days later, he gave the Cook County sheriff's police written permission to search the house.

On cross-examination, Ed Kuba admitted to a conviction for attempted theft nine years earlier and also acknowledged that his brother sold cocaine for a living and that it was not unusual for him

to leave the house late at night with strangers. He denied, however, that John frequently stayed away from home for long periods of time; that he (Ed) had suggested to Officer Bettiker in a late March conversation that John may have been hiding from unknown persons to whom he owed large sums of money; or that he told the police that John had returned home on Friday, April 1. He stated that, upon information given to him, he told the police that John had returned home on Friday, March 29, but when shown a calendar establishing that March 29, 1983, was a Tuesday, he conceded the inaccuracy of that information.

Gary Campbell testified that he had known John Kuba, with whom he shared an interest in racing cars, for about six or seven years, and that shortly after reading a newspaper report that John was missing, he learned that defendant had been driving the Nova and selling parts John had purchased for it. When he warned defendant that John would be very angry, defendant replied, "Don't worry about it. John's dead."

David Pinter, a supervisor at United Parcel Service (UPS), testified that defendant did not come in to work on Thursday, March 31, and that when he reported for his regular 2:30 to 7:30 a.m. shift the following day, April 1, he appeared to be "kind of shaken up." Defendant told him that he thought that his uncle's body had been found and made some reference to funeral arrangements.

Mrs. J. Seaquist testified that she last saw her daughter, Joanne, at about 1:45 p.m. on Saturday, April 2, 1983, when she drove her to the Marriott Lincolnshire Resort where she worked as a waitress. At about 11 p.m. that night, Joanne called home and left a message with her other daughter, Jennifer, that defendant, whom she had known since childhood, would be driving her home later. The following day—Easter Sunday—Jennifer called defendant, told him that Joanne had not returned home, and asked if she was with him. Defendant told Jennifer that at Joanne's request, he had driven her to a bar called the Halfday Inn the previous night and had not seen her since. She (Mrs. Seaquist) also telephoned defendant that day, emphasizing the family's concern and their intention to call the police, but defendant again denied any knowledge of Joanne's whereabouts. Several weeks later, she hand delivered a written plea to defendant for his help in locating Joanne, but he told her that there was nothing he could do.

Officer Peter Peterson testified that on April 5, 1983, the day after Joanne's family reported her missing, he interviewed defendant and, two days later, took a written statement from him. In that statement, which was read to the jury, defendant recounted that on Satur-

day, April 2, he was at home playing pool with his friend Jon Johnson when, at about 8 p.m., Joanne called and asked him to pick her up. He and Johnson arrived at the Marriott sometime between 11 p.m. and midnight and left, with Joanne, at about 2:30 a.m. Unable to find the bar where they had planned to go, they stopped instead at the Halfday Inn Lounge and, after having one drink, then drove to defendant's house and spent the remainder of the night reminiscing about high school. After Johnson left, at about 5:30 a.m., he offered to drive her home, but on the way, she changed her mind and asked him to take her back to the Halfday Inn because several of her friends frequently met there after finishing their night jobs. He reluctantly agreed, and when they arrived at the bar, she wished him a happy Easter, kissed him goodbye, and then exited the car, waving to him as he drove away. He returned home and slept until late that afternoon. Defendant also related to Peterson that approximately one week earlier, after a chance meeting at the Halfday Inn, his uncle brought Joanne to the house and privately suggested that they both have sex with her, but he refused, explaining to John that Joanne was "not that kind of girl."

Patrick Quillinan, Katherine Owens, and Patty Gaessler, friends of Joanne, variously testified that Joanne, Johnson, and defendant left the bar at the Marriott resort sometime late Saturday night, and that when they questioned him about her subsequent activities, defendant repeated to them what he had earlier told Joanne's family and Officer Peterson.

Sigel Roush, resident manager of The Lockup, where the bodies were discovered, testified that the storage facility contained approximately 400 units of varying sizes and that on April 5, 1983, when defendant inquired about renting a storage space, all but one (G-10) were occupied. Although he explained that the unit was not rentable because cans of cola left by the previous lessee had exploded during the winter, resulting in the spoilage of the syrup, which emitted an extremely bad odor and left stains on the floor, defendant nevertheless stated that he wished to rent the space, and signed a lease for it for the remainder of April. Defendant thereafter submitted rental payments of $98 each month to renew the lease through the end of July, at about which time he (Roush) noticed a very bad odor, unlike anything—including the spoiled cola—he had ever smelled before, from inside unit G-10. The next time defendant came in to extend the lease, on August 10, he told him about the odor and asked, "What the hell have you got in there?" adding, somewhat facetiously, "It smells like somebody died in there." When defendant responded that there

were some old watermelons in the trunk, he (Roush) ordered him to remove them, warning, "Either you get them out or I am going to get them out, but that's got to be cleaned up because we can't rent the [adjoining] unit until you do." Defendant assured him that he would clean the space and paid another three months rent, but upon returning from his vacation two weeks later, his (Roush's) secretary reported that she had not seen defendant and that the odor had become worse. Finally, on September 3, he cut off the lock on the unit and went inside. One of the tires on the Chevrolet stored therein was flat, and the floor was covered with a horrible smelling, sticky, amber fluid which had leaked under the steel wall into the unit G-11. Even though the fluid did not appear to be blood, he nevertheless began to wonder if there might be a body inside the trunk, and, at that point, he closed the door, went back to his office, and called the police to come "to check it out." When the officers arrived, he led them to the unit and reopened the door, whereupon one of them immediately stated, in reaction to the odor, "There's a body in there." Following the removal of the bodies, which he did not witness, he gave a written statement to the police, and, two days later, identified defendant from a photograph as the lessee of unit G-10.

Officer Bettiker testified that when questioned in late April 1983, concerning the disappearance of John Kuba, defendant stated that sometime during the early morning hours of March 26, he was awakened by the sounds of his uncle's footsteps in the kitchen—which was directly above his basement bedroom—and other persons entering the house. Following a brief conversation, he heard people leaving and neither saw nor heard from Kuba thereafter.

Upon his arrival at The Lockup on September 3, after being notified that an automobile registered to John Kuba had been located there, he observed that unit G-10 was open and that several officers were inside processing the exterior of the vehicle for fingerprints. As he approached, he recognized the odor emanating therefrom as that of a decomposing human body. After checking the facility's rental records, he called his supervisors and then returned to the storage unit where evidence technicians were in the process of forcing open the trunk. Inside, they found the body of John Kuba lying toward the rear of the compartment and the partially clothed body of Joanne Seaquist wrapped in a sheet—identified by Ed Kuba later that day as one from his father's house—lying on top of him. Following an interview with Roush, an arrest warrant was issued for defendant on charges of concealing their homicidal deaths.

Officer Bettiker then reiterated his suppression hearing testimony

concerning the September 4 interrogation of defendant in Iowa City and further testified as to statements made by him in the course thereof. According to Officer Bettiker, when asked why he put the car in the storage locker, defendant blurted out "[m]y life is worth more than a plugged nickel," adding that if they (the officers) had received a telephone call from someone threatening that they "would end up the same as John," they would have done the same thing. In contrast to the statement he made in April, defendant then told them early in the morning of March 26, two persons came to the house in Glenview requesting to speak to his uncle. After allowing them inside, he went down to his basement bedroom to go to bed, but upon hearing a loud argument taking place upstairs, he got up and hid in a crawlspace, remaining there for a considerable time after the arguing had stopped. By the time he went upstairs, everyone, including his uncle, had gone.

On cross-examination, Officer Bettiker acknowledged that in a mid-April conversation, Ed Kuba told him that his brother may have been hiding from persons to whom he owed large sums of money; and that when defendant was asked, on September 4, "Why the girl?" his response was "she shouldn't have been with John the week before" and had been "in the wrong place at the wrong time."

It was then stipulated that John Kuba died from multiple bullet wounds to the chest; that a .22-caliber bullet recovered from the wall of Kuba's bedroom was fired from the same gun as the bullets removed from his body by the medical examiner; that the cause of Joanne Seaquist's death was ligature strangulation; that, when discovered, both bodies were in an advanced stage of decomposition; and that in response to questions as to why he did not dispose of the car, defendant sobbed and said, "I didn't know what to do."

Defendant then testified that after a chance meeting at the Halfday Inn early one morning in mid-March 1983, John brought Joanne Seaquist—whom he had not seen in about 1½ years—to the house to see him. John repeatedly urged Joanne to model some lingerie he had obtained from a fashion show, but she refused. After talking for nearly three hours, he (defendant) told her that he was very tired from working all night and drove her home.

Defendant then reiterated that portion of the previously summarized statement he made to Officer Peterson a few days after Joanne was reported missing regarding the events of the night of April 2, beginning with her 8 p.m. telephone call from the Marriott resort to their eventual return to his home. Contrary to that earlier statement, however, defendant testified that shortly after Jon Johnson left, John Kuba—who had been gone since March 26—returned home, unshaven

and disheveled. After a brief conversation with John, he suggested to Joanne that he drive her home, but John interrupted, saying "Don't worry about it." Tired from a recent trip to Florida, he left John and Joanne sitting in the kitchen and retired to his room. Sometime later, he was awakened by the sounds of persons arguing upstairs in loud voices, one of which he recognized as John's. A few seconds later, he heard several gunshots, whereupon he ran across the basement and hid in a crawlspace from which he could hear footsteps and "a commotion" in John's bedroom directly above him. He remained in the crawlspace for about an hour before going upstairs to investigate. As he was going through the house, checking each room for signs of John and Joanne, the telephone rang. When he answered it, the caller said, "You have a problem now. You have to get rid of the Chevy on the driveway." Unsure of what to do, he continued searching the house for some indication of what had occurred. Within half an hour, the same person called again, stating in a threatening manner, "Hey, you son of a bitch, the car's still in the driveway. You better get it out of there or you're going to end up with them." Although frightened by the threat, he did not follow the caller's directive, thus prompting a third call from another man with a much deeper voice, warning him that if he did not move the car, he would "end up dead and *** be put in the trunk with them." Because he did not know what had happened to John and Joanne and was frightened and confused, when Jennifer Seaquist called, at about 4 p.m. inquiring as to her sister's whereabouts, he told her what he subsequently told the police, *i.e.*, that he had driven Joanne to the Halfday Inn several hours earlier and had not seen her since. The following afternoon, Monday, April 4, he received a fourth telephone call in which he was told, "This is your last chance. You better move it. You're going to end up dead." For lack of another idea as to what to do with the car, the next day, April 5, he drove it to The Lockup, and executed a lease for a unit in which to store it. Defendant acknowledged the conversation with Roush on August 10 concerning the odor emanating from the unit and that Roush warned him to "do something about the smell or I will," but further stated that he did nothing because he was afraid, having received numerous telephone calls throughout the summer from unknown persons who stayed on the line for awhile and then hung up.

OPINION

Defendant first contends that all physical evidence relating to the discovery of the bodies and the statements he made thereafter should have been suppressed as the products of an unlawful warrantless

search by the police of the storage unit and the automobile therein and that the trial court erred in ruling that because he did not own the automobile in which the bodies were found, he lacked standing to object to the search of it.

■ In *Rakas v. Illinois* (1978), 439 U.S. 128, 58 L. Ed. 2d 387, 99 S. Ct. 421, the United States Supreme Court stated, with respect to motions to suppress evidence, that a determination of the existence of standing is better analyzed as a substantive question of whether the disputed search and seizure infringed upon an interest of the defendant which the fourth amendment was designed to protect from governmental intrusion. In regard thereto, the court held that, while relevant, the existence of a legally recognized property interest in the place searched is neither necessary to nor controlling of a fourth amendment protection claim; rather, the determinative question is whether the claimant had a legitimate expectation of privacy in the premises or property searched (439 U.S. 128, 143, 58 L. Ed. 2d 387, 401, 99 S. Ct. 421, 430), and that the burden is on the proponent of the motion to prove that his personal fourth amendment rights were violated by the allegedly unreasonable search and seizure (439 U.S. 128, 131 n.1, 58 L. Ed. 2d 387, 393 n.1, 99 S. Ct. 421, 424 n.1; Ill. Rev. Stat. 1985, ch. 38, par. 114—12).

In this case, defendant acknowledged that he did not own the car containing the bodies. He posits, however, that as lessee of the storage unit, he had a legitimate expectation of privacy in the "space" therein which necessitated the procurement by the police of a warrant to search it (the space) or its contents (the car). Thus, in asserting that his fourth amendment rights were violated, defendant presents us with a two-part inquiry relating to the two separate "searches."

With respect to his argument regarding the interior "space" of the unit, we agree, in the light of the principles enunciated by the Supreme Court, that the execution of a lease for the storage unit gave defendant a valid possessory interest in it and that the affixation of a lock on it constituted a manifestation by him of a legitimate expectation of privacy therein. We do not agree, however, with his conclusion that the disputed search of that "space" was, therefore, prohibited by the fourth amendment.

The evidence established that in mid-August, the manager of the storage facility (Roush) advised defendant that because of the odor emanating from unit G-10, he had been unable to rent the adjacent storage area. He then directed defendant to clean his unit and warned him that if it was not taken care of, he intended to go inside and clean it himself—to which defendant replied, "Okay." After the pas-

sage of nearly three weeks of inaction by defendant, Roush cut the lock, opened the door, and conducted an inspection of the interior of the unit to locate the source of the odor for the purpose of eradicating it. He thereafter called the police and informed them of his findings of an old, white car from which a horrible-smelling, amber fluid had leaked onto the floor and, upon their arrival, reopened the door of the unit and thereby revealed to them the "space" therein containing a car matching the description of one owned by John Kuba and bearing license plates registered to him.

On the basis thereof, we are of the opinion that both the warning by Roush and defendant's failure to heed it negated any reasonable expectation of privacy he otherwise may have had in the storage area, or at least constituted an assumption of the risk of the invasion of that privacy. More important, however, we find that the discovery of the car, which, being the receptacle of the bodies, was itself critical evidence of the concealment, did not result from a government search as is required to establish a fourth amendment violation but instead, from an inspection, or "search," by a private individual—to which fourth amendment prohibitions do not apply (*People v. Heflin* (1978), 71 Ill. 2d 525, 376 N.E.2d 1367)—who thereafter put it in the plain view of the officers.

As to legality of the "second" search, *i.e.*, of the trunk of the car, defendant asserts that notwithstanding the fact that he did not own the car, his expectation of privacy in the locked storage unit extended to the items stored therein and that the fourth amendment therefore proscribed the warrantless search and seizure of the contents of the car by the police.

Although we have already expressed our belief that defendant's expectation of privacy was not reasonable in the face of Roush's express warning of his intention to enter and clean the unit—to which defendant appears to have assented—our resolution of this question does not turn on the reasonableness of the expectation but, rather, on the legitimacy of it.

As noted by the Supreme Court in *Rakas* "[o]bviously, *** a 'legitimate' expectation of privacy by definition means more than a subjective expectation of not being discovered" (*Rakas v. Illinois* (1978), 439 U.S. 128, 143 n.12, 58 L. Ed. 2d 387, 401 n.12, 99 S. Ct. 421, 430 n.12), and no matter how great or justified a subjective expectation of privacy might be, to be legitimate it "must have a source outside the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society" (439 U.S. 128, 144 n.12, 58 L. Ed. 2d 387, 401

n.12, 99 S. Ct. 421, 431 n.12).

■ Here, in view of the uncontested evidence establishing that defendant neither owned the car, nor, obviously, had the permission of the owner (John Kuba) to place it in the storage unit or otherwise use or dispose of it, and that he had in fact, falsely reported to Ed Kuba and to the police that it had been stolen, it is clear that his possession of the car was wrongful and that his expectation of privacy in its concealed spaces was not, irrespective of his subjective expectations to the contrary, "legitimate" for purposes of the fourth amendment protections. Accordingly, we find that his motion to suppress the evidence relating to the bodies concealed in the trunk and the statements he later made thereabout to the police was properly denied.

■ Similarly, we find no merit in defendant's contention that the trial court erred in ruling that his statements to the police were voluntarily made after a knowing and intelligent waiver of his constitutional rights and were, therefore, admissible. He argues that although he repeatedly stated that he had been advised by counsel not to answer their questions and that he did not wish to do so without his attorney present, the interrogating officers continued to question him, in violation of his fifth and sixth amendment rights to counsel, until he finally agreed to talk to them.

The evidence introduced at the hearing on his motion to suppress statements was set forth in some detail at the outset of our opinion and repetition of it here would serve no useful purpose. It suffices to say that the credibility of the arresting officers was a matter to be judged by the trial court, and because, from our reading of the transcript, their versions of the interrogation did not materially differ from that to which defendant testified, except perhaps as to matters of subjective thoughts and feelings, we cannot say that the trial court's determination was erroneous. Moreover, considering the overwhelming evidence against him, we believe that if anything, Officer Bettiker's testimony as to defendant's statements that "[his] life was worth more than a plugged nickel," and that if threatened as he had been, they (the officers) "would have done the same thing" actually lent support to defendant's compulsion defense and thus, we fail to see what prejudice he suffered as a result of their admission.

Defendant also contends, in essence, that the trial court substantially impaired his constitutional right to present a defense (see *Washington v. Texas* (1967), 388 U.S. 14, 18 L. Ed. 2d 1019, 87 S. Ct. 1920 (the right to present a defense is a fundamental element of due process)) and thereby denied him a fair trial by (a) precluding defense counsel from explaining, in his opening statement, the meaning of

compulsion as a defense to the crime charged, (b) excluding evidence crucial to that defense, and (c) giving a non-IPI instruction which had the effect of negating it.

Initially, we note that as provided in section 7—11(a) of the Code of Criminal Procedure (Ill. Rev. Stat. 1985, ch. 38, par. 7—11(a)):

> "(a) A person is not guilty of an offense, other than an offense punishable with death, by reason of conduct which he performs under the compulsion of threat or menace of the imminent infliction of death or great bodily harm, if he reasonably believes death or great bodily harm will be inflicted upon him if he does not perform such conduct."

■ As to the restriction of opening statement, defendant's argument that by curtailing his counsel's attempts to explain the meaning of compulsion, the trial court prevented him "from giving the jury an idea of what the defense intended to prove" fails for two reasons. First, it is a fundamental maxim of criminal procedure that instructing the jury as to matters of law is a judicial function and that any attempt by trial counsel to do so constitutes an impermissible intrusion into the exclusive province of the trial court. (*People v. Boyd* (1980), 88 Ill. App. 3d 825, 410 N.E.2d 931; *People v. Campbell* (1973), 13 Ill. App. 3d 31, 299 N.E.2d 439.) Thus, we find no error by the trial court in sustaining the State's objections to those of defense counsel's remarks proposing to instruct the jury regarding the definition of compulsion as a legal defense.

■ Furthermore, the record clearly shows that the premise upon which defense counsel expounded throughout his opening statement—as well as closing argument—was that although defendant did, in fact, conceal the car containing the bodies in the storage locker, the evidence would show that he was a "fear-stricken and fear-driven" young man who felt compelled—or forced—to do so because of multiple death threats he received from unknown persons whom, he assumed, were responsible for the murders. Thus, from a reading of counsel's statement in its entirety, there can be no doubt that the jury was more than adequately apprised of the theory of defense.

Defendant further maintains, however, that by sustaining the State's motions and objections to the introduction of evidence concerning the criminal background of and certain acts of violence committed by and against John Kuba, the trial court precluded him from substantiating his claim that he was compelled by fear of death to follow the directives of the anonymous callers threatening that if he did not dispose of the car containing the bodies, he too would be killed.

Specifically, defendant sought to present evidence, through his

own testimony and that of Ed Kuba, regarding John Kuba's activities as a cocaine dealer and, in particular, two alleged physical assaults upon Kuba the previous year—in one of which Kuba was attacked with a hammer—by persons to whom he owed money in connection with drug transactions. According to defendant, the purpose of this evidence was to support his defense of compulsion by showing that he knew that John Kuba "was a tough character [and] associated with tough customers who didn't hesitate to kill anyone who got in their way or gave them any trouble."

The decision whether to exclude evidence as irrelevant because it is too uncertain and/or speculative or too remote in time to be probative of the fact or issue it is being offered to prove is within the discretion of the trial court and its ruling will not be reversed absent a clear showing of an abuse of that discretion. *People v. Ward* (1984), 101 Ill. 2d 443, 463 N.E.2d 696; *People v. Hoffman* (1986), 146 Ill. App. 3d 823; *People v. Decker* (1984), 126 Ill. App. 3d 428, 467 N.E.2d 366.

In our opinion, the evidence purporting to show that John Kuba had been the victim of physical assaults by unidentified persons seeking to recover money from him in two incidents occurring approximately four and nine months, respectively, prior to the events at issue was simply too remote in time and, more importantly, too uncertain and speculative in nature—particularly since no connection was made between Kuba's assailants and the anonymous callers who purportedly threatened defendant—as to be probative of the question whether he was acting under the threat of imminent death or great bodily harm at the time he concealed the bodies. See *People v. Ward* (1984), 101 Ill. 2d 443, 455-56, 463 N.E.2d 696, 701-02.

Moreover, the jury was made aware of the nature and hazards of Kuba's lifestyle and the caliber of persons with whom he associated from defendant's own testimony and from other evidence establishing, *inter alia*, that Kuba sold cocaine for a living; that he frequently left home in the middle of the night with strangers and remained away for days at a time; that his brother, Ed, advised the police during their investigation into his disappearance that John may have been hiding from people to whom he owed money; and that he died from multiple gunshot wounds. Consequently, we conclude that the inferential value, if any, of the proffered evidence was also cumulative and that its exclusion neither deprived defendant of his right to present a defense nor constituted an abuse of discretion by the trial court.

With respect to defendant's argument that by supplementing the

Illinois Pattern Instruction on compulsion No. 24—25.21, with a non-IPI instruction tendered by the State, the trial court virtually eliminated the possibility of acquittal by reason of compulsion.

In addition to Illinois Pattern Jury Instruction, Criminal, No. 24—25.21 (2d ed. 1981) (hereinafter IPI Criminal 2d) which provides:

"It is a defense to the charge made against the defendant that he acted under the compulsion of threat or menace of the imminent infliction of death or great bodily harm, if he reasonably believed death or great bodily harm would be inflicted upon him if he did not perform the conduct with which he is charged,"

the trial court gave, over defendant's objection, the following instruction tendered by the State:

"You are instructed that a threat of future injury is not sufficient to excuse criminal conduct."

It is defendant's position that this instruction effectively nullified his defense of compulsion "since any threat sufficient to create the compulsion would have to be based on some future, albeit imminent, injury."

■■ The purpose of jury instructions is to convey to the jurors the correct principles of law applicable to the evidence presented in the case before them (*People v. Dordies* (1978), 60 Ill. App. 3d 621, 377 N.E.2d 245), and while IPI instructions are usually preferred (*People v. Larson* (1980), 82 Ill. App. 3d 129, 402 N.E.2d 732), the decision to give a tendered non-IPI instruction is always within the discretion of the trial court (*People v. Jones* (1986), 145 Ill. App. 3d 835), provided that it is an accurate, simple, brief, impartial, nonargumentative statement of the law (87 Ill. 2d R. 451; *People v. Jones* (1986), 145 Ill. App. 3d 835).

■■ In the instant case, the trial court's decision to give the instruction in question was based on its determination that it was an accurate statement of the case law interpreting the statutory definition of compulsion (see *People v. Bryant* (1983), 115 Ill. App. 3d 215, 450 N.E.2d 744; *People v. Jackson* (1981), 100 Ill. App. 3d 1064, 427 N.E.2d 994; *People v. Colone* (1981), 56 Ill. App. 3d 1018, 372 N.E.2d 871; *People v. Robinson* (1976), 41 Ill. App. 3d 526, 354 N.E.2d 117; *People v. Davis* (1974), 16 Ill. App. 3d 846, 306 N.E.2d 897), and that in view of the evidence presented, it was warranted. Although we believe that in most cases IPI Criminal 2d No. 24—25.21 sufficiently informs the jury as to the definition of compulsion, we cannot say, under the circumstances of this case, wherein defendant testified that he had received a series of threatening telephone calls over a period of

time, that the giving of the instruction at issue, which, in our opinion, merely clarifies the term "imminent," constituted an abuse of discretion or, as defendant asserts, negated the defense case.

Defendant next contends that certain questions asked and comments made by the prosecutor were so improper and prejudicial as to have deprived him of a fair trial.

 In this regard, he first asserts that error occurred when the State was allowed, over defense counsel's objection, to ask Officer Bettiker on cross-examination whether his (defendant's) attorney had advised him not to sign or say anything when questioned by the police. Relying primarily on *People v. Meredith* (1980), 84 Ill. App. 3d 1065, 405 N.E.2d 1306, and the cases cited therein, he argues, essentially, that this line of questioning was deliberately and improperly designed to infer consciousness of guilt from his decision to exercise his rights to counsel and to remain silent by implying that his attorney would not have given him such advice if he did not "have something to hide."

In *Meredith*, the defendant was tried for the murders of two men shot in the course of a tavern brawl. Claiming innocence, the defendant testified at trial that he ran out of the bar when he heard shots being fired, but upon learning the following day that two men had been killed and that he was wanted for what he presumed to be questioning in connection therewith, he contacted his attorney, who then accompanied him to the police station. With respect thereto, the prosecutor opined during closing argument:

> "[H]e says he talked to these people and they told him about the shooting and he called his lawyer ***. Well, I submit he knew that he had shot those people [and] that is why he went to *** call his attorney."

In overturning defendant's conviction and ordering a new trial, the *Meredith* court held that it was reversible error for the prosecutor to equate defendant's exercise of his constitutional right to seek the advice of counsel with an admission of guilt, particularly since the evidence was not otherwise overwhelming on the issue of guilt and the verdict depended primarily on the jurors' assessment of the credibility of the witnesses in determining which of their versions of the shooting to believe. *People v. Meredith* (1980), 84 Ill. App. 3d 1065, 1071-75, 405 N.E.2d 1306, 1312-13.

Initially, we note that although the State disavows defendant's allegation by asserting, as its sole response thereto, that "at no time during cross-examination of Investigator Bettiker did the [prosecutor] *ask* whether defendant's lawyer had told him not to sign or say any-

thing" (emphasis added), our review of the record reveals that in answers to a series of inquiries by the prosecutor as to what defendant said in reply to certain questions posed by him and Officer Betz, Bettiker did in fact state at least three times that defendant informed them that he had been advised by counsel to remain silent and sign nothing. Because we fail to see the relevance of this line of questioning and since the State has declined to enlighten us thereon, we find ourselves in agreement with defendant that it was intended to serve as circumstantial evidence of defendant's guilt and was, therefore, improper under the principles enunciated in *Meredith*.

Unlike *Meredith*, however, the evidence in this case establishing that defendant had concealed two homicidal deaths was not only overwhelming but, indeed, virtually uncontested, the only disputed issue being whether he was acting under compulsion when he did so. In view thereof, we cannot see how he was prejudiced by the testimony at issue nor do we believe that it in any way contributed to his conviction, and therefore find it harmless beyond a reasonable doubt. *People v. McGee* (1982), 110 Ill. App. 3d 766, 443 N.E.2d 1057; *People v. Kerans* (1982), 103 Ill. App. 3d 522, 431 N.E.2d 726; *People v. Bolden* (1978), 59 Ill. App. 3d 441, 375 N.E.2d 898.

Defendant also argues that he was substantially prejudiced by the State's closing and rebuttal arguments, in which the prosecutors intimated that certain relevant evidence favorable to the State had been withheld, expressed their personal belief in his guilt, argued sympathy for the victims, and speculated on his involvement in their murders.

■■■ While not condoned, improper prosecutorial remarks generally do not warrant reversal unless it can be said that they were a material factor in defendant's conviction, the test of which is whether the jury would likely have reached a contrary verdict had the comments not been made. *People v. Piscotti* (1985), 136 Ill. App. 3d 420, 483 N.E.2d 363; *People v. Witted* (1979), 79 Ill. App. 3d 156, 398 N.E.2d 68.

■■■ Although defendant has provided us with record citations to only two of the comments about which he complains, we have carefully reviewed the transcript of closing arguments in its entirety and note, initially, that in their zeal to persuade the jury of the merits of their respective positions concerning the weight and credibility of the evidence presented, counsel for both sides occasionally overstepped the bounds of propriety. We do not believe, however, that the prosecutors' comments, even where improper, were, either individually or cumulatively, so flagrant or prejudicial as to have been a material factor in defendant's conviction; or that in view of the overwhelming evi-

dence, he likely would have been acquitted had they not been made.

 Defendant's final contention is that the imposition of consecutive sentences on his convictions for two counts of concealment of homicidal death was improper under section 1005—8—4 of the Unified Code of Corrections (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—4), which provides:

> "(a) When multiple sentences of imprisonment are imposed on a defendant at the same time, *** the sentences shall run concurrently or consecutively as determined by the court. *** The court shall not impose consecutive sentences for offenses which were committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective, unless, one of the offenses for which defendant was convicted was a Class X or Class 1 felony and the defendant inflicted severe bodily injury, in which event the court may enter sentences to run consecutively. ***
>
> (b) The court shall not impose a consecutive sentence unless, having regard to the nature and circumstances of the offense and the history and character of the defendant, it is of the opinion that such a term is required to protect the public from further criminal conduct by the defendant, the basis for which the court shall set forth in the record."

The offense of concealment of homicidal death—a Class 3 felony (Ill. Rev. Stat. 1985, ch. 38, par. 9—3.1)—consists of two elements: (1) knowledge that a homicidal death had occurred and (2) performance of some affirmative act of concealment of the death. *People v. Mahon* (1979), 77 Ill. App. 3d 413, 395 N.E.2d 950; *People v. Stiles* (1977), 46 Ill. App. 3d 359, 360 N.E.2d 1217.

Following a sentencing hearing whereat testimony was presented and argument made on factors in aggravation and mitigation, the trial judge stated:

> "I do believe that under the totality of all the factors that are presented to the Court, that the evidence does indicate that there was not a single course of conduct for which there was a trial alleging that [defendant] had concealed two homicides. I therefore conclude that by discretion I have the right to impose consecutive terms based upon having considered the nature of the Defendant's background, nature and circumstances, his history and character, and having considered the continuation of the extended instances going from approximately April *** into early September. And I believe under the circumstances that a consecutive term is necessary to protect the public."

Defendant disputes the court's findings, maintaining that (a) both convictions arose from a single course of conduct, and (b) there was no basis for the conclusion that consecutive sentences were necessary for the protection of the public.

Recapitulating the evidence that Ed Kuba's last contact with his brother, John, was on March 24, 1983; that a few days thereafter, defendant both used John's new car and sold parts John had purchased for it; that defendant was absent from work on March 31; that he told his supervisor the following day that he thought that his uncle's body had been found and made some reference to funeral arrangements; that John died from multiple gunshot wounds; and contrasting it to the evidence that Joanne Seaquist was alive until at least the late night/early morning of April 2, 1983; that the cause of her death was ligature strangulation; and that when found, her body was naked from the waist down, the State argues that "[b]ecause the victims were noticed missing as much as a week apart and since the means of death were dissimilar, evidencing separate occasions and motivation, it is clear that John Kuba and Joanne Seaquist were killed and their bodies concealed on separate dates," and that in the light of defendant's background and character, "the court clearly did not abuse its discretion and properly imposed consecutive sentences to protect the public from further criminal activity by [him]."

■ While this evidence might, arguably, support the State's hypothesis that John Kuba was killed sometime before April 3, and that defendant had knowledge thereof, absent from the State's case was evidence that, in addition, he performed some affirmative acts to conceal Kuba's corpse prior to April 5, when he placed the car containing both bodies in the storage facility. (See *People v. Vath* (1976), 38 Ill. App. 3d 389, 347 N.E.2d 813.) Neither has the State presented authority for the premise that the steps he thereafter took to prevent discovery of the bodies constituted separate "acts" of concealment justifying the imposition of consecutive sentences under section 5—8—4(a). The only case cited in its brief, *People v. Schlemm* (1980), 82 Ill. App. 3d 639, 402 N.E.2d 810, is not supportive of that proposition and, in any event, is readily distinguishable since, there, the defendant was also convicted of the murders of the two individuals whose bodies he subsequently concealed.

■ Finally, keeping in mind the authorities holding that consecutive sentences should be imposed sparingly and only where it is shown that they are necessary to protect the public from further criminal conduct by the defendant (*People v. Gray* (1984), 121 Ill. App. 3d 867, 460 N.E.2d 354; *People v. Griffin* (1982), 113 Ill. App. 3d 184, 446

N.E.2d 1175; see Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—4(b)), we are of the opinion that it was an abuse of discretion to impose them here. With respect to the history and character of defendant, the record establishes that he was only 20 years old when he committed these crimes, that he had been steadily employed not only at the time of their commission but throughout the trial court proceedings, and that his criminal background consisted of only one misdemeanor conviction. As to the nature and circumstances of the crimes, we note that, though reprehensible—particularly in terms of their emotional impact upon the victims' families—the conduct involved was neither violent nor of a type otherwise posing a significant threat to society in general or likely to be repeated by defendant in the future. Accordingly, defendant's five-year sentences are hereby modified to run concurrently rather than consecutively.

For the reasons stated, we affirm defendant's convictions but modify his sentences to run concurrently.

Affirmed in part, modified in part.

LORENZ and MURRAY, JJ., concur.