# Illinois Official Reports

## Appellate Court

---

*People v. Brown*, 2017 IL App (3d) 140921

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RAY A. BROWN, JR., Defendant-Appellant. |
| District & No. | Third District<br>Docket No. 3-14-0921 |
| Rule 23 order filed | April 27, 2017 |
| Rehearing denied | May 16, 2017 |
| Motion to publish allowed | June 29, 2017 |
| Opinion filed | June 29, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Peoria County, No. 14-CF-406; the Hon. John P. Vespa, Judge, presiding. |
| Judgment | Affirmed in part and vacated in part; cause remanded with directions. |
| Counsel on Appeal | Michael J. Pelletier, Peter A. Carusona, and Sean M. Conley, of State Appellate Defender's Office, of Ottawa, for appellant.<br><br>Jerry Brady, State's Attorney, of Peoria (Patrick Delfino, Lawrence M. Bauer, and Dawn D. Duffy, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |

JUSTICE CARTER delivered the judgment of the court, with opinion.
           Justice McDade concurred in the judgment and opinion.
           Justice Wright concurred in part and dissented in part, with opinion.


**OPINION**

¶ 1        Defendant, Ray A. Brown, Jr., appeals following his conviction for domestic battery. He argues that his counsel rendered constitutionally ineffective assistance when she requested a jury instruction on self-defense but presented in closing argument a theory of the case inconsistent with such an instruction. Alternatively, defendant argues that counsel was constitutionally ineffective in that she proceeded under an actual conflict of interest in posttrial proceedings, where the only issue she raised was her own ineffectiveness at trial. Finally, defendant contends that a number of monetary assessments were imposed by the circuit clerk without authority, and he requests that this court vacate those assessments. We affirm in part, vacate in part, and remand with instructions.

¶ 2                                FACTS
¶ 3        Defendant was charged by indictment with domestic battery (720 ILCS 5/12-3.2(a)(2) (West 2014)). The cause proceeded to a jury trial on September 15, 2014.

¶ 4        Prior to commencing jury selection on the first day of trial, the circuit court summarized for the record an in-chambers discussion held between the parties and the court. Per the court's summary, defense counsel had expressed a possible need to file a notice of the affirmative defense of self-defense. Counsel had explained in chambers that while such a defense conflicted with defendant's own version of events, she had discovered evidence in a police report that would nevertheless support such a defense. The court found that because the evidence of self-defense would be brought through the State's own witness, there was no possibility of surprise to the State. Thus, the court ruled that the defense could argue self-defense at trial, despite not having filed a formal motion. Further, the court ruled that if any evidence was in fact put forth supporting a theory of self-defense, the corresponding jury instruction would be delivered. The parties agreed to the accuracy of the court's summarization.

¶ 5        At trial, Holly Howard testified that she and defendant were in a dating relationship on June 5, 2014. On that day, she and defendant argued over the phone. After the argument, defendant invited Howard to his grandmother's house, where the two spent time together that evening. Howard testified that at approximately 10:30 p.m., defendant again became angry and began yelling at her. She testified that defendant lunged at her and choked her. Howard also recalled "hitting the side of the house." She was eventually able to leave and call for a ride. A friend later took her to a hospital. Howard testified that she did not strike defendant.

¶ 6        Officer Patrick Jordan testified that he spoke with Howard at St. Francis Hospital on June 6, 2014. After meeting with Howard and observing bruises on her neck and arms, Jordan and another officer went to defendant's residence. Jordan testified that defendant's story changed multiple times throughout their conversation. Defendant first disavowed knowing anyone by the name of Holly Howard. He then admitted that he knew her but told

Jordan that she had not come to his house the previous night. Defendant eventually admitted to Jordan that he had been with Howard the night before and that the two had engaged in an argument.

¶ 7 Jordan recounted what defendant told him next: "He said during the course of the argument, she accused him of cheating and pushed him, so he grabbed her by the neck to push her off of him, and then when she wanted to walk away, he grabbed her."

¶ 8 Defendant testified in his own defense. He testified that he knew Howard as Holly Brown, as that was the name she had originally given him. The two had dated, but he had ended the relationship approximately six months earlier. The two remained friends on Facebook, and defendant admitted that they exchanged messages through that medium on June 5, 2014. However, defendant denied actually seeing Howard on that day.

¶ 9 Defendant was "pretty sure" he had last seen Howard on June 4, 2014. He testified that he and Howard did not argue on that day and they did not engage in any sort of fight, be it verbal or physical. Defendant testified that he did not make any of the statements that Jordan ascribed to him. Specifically, defendant denied ever telling Jordan that he pushed Howard away from him. On cross-examination, when asked if he recalled telling Jordan that Howard pushed him, defendant responded: "I never said no such thing." He denied ever putting his hands on Howard.

¶ 10 Following the close of evidence, the parties and the court held an off-the-record conference in chambers. Upon return to the courtroom, the court explained that the defense was requesting an instruction on self-defense. While the State initially opposed the instruction, it withdrew that opposition.

¶ 11 After the jury reentered the courtroom, the parties proceeded to their closing arguments. Defense counsel argued that the State's evidence was insufficient. Specifically, counsel attacked Howard's credibility, arguing that she had concocted the story as revenge against defendant for ending their relationship. Following arguments, the court delivered instructions to the jury. Those instructions included the following directive: "A person is justified in the use of force when and to the extent that he reasonably believes that such conduct is necessary to defend himself against the imminent use of unlawful force."

¶ 12 The jury found defendant guilty. Prior to sentencing, defendant filed a *pro se* letter in an apparent attempt to file an appeal. In the letter, defendant stated that he wished to appeal the jury's verdict "for a couple of reasons." Explaining one of those reasons, defendant simply wrote: "One witness of mine was not evoked to court." At a subsequent hearing, the court declared that it would not consider defendant's *pro se* filing, both because he was represented by counsel and because it was premature.

¶ 13 The cause proceeded to sentencing on November 12, 2014. The hearing on that date commenced with defense counsel making an oral motion to set aside the verdict. Explaining the motion, counsel stated: "[Defendant] wrote a written motion which we would adopt as part of our motion, I guess, as part of the motion to set aside." Asked by the court if she was asking that the *pro se* motion be considered in its entirety, counsel explained further:

> "As far as, Judge, there's—I wouldn't know necessarily there's anything of substance in there, but we did make an allegation or make a statement about a witness which I believe boils down to our communications issue between him and I. But in any case,

he was not able to call a witness that he wanted to call and as far as that motion brings forward, we would adopt that part."

¶ 14 The court asked if defense counsel had any witnesses regarding her motion, to which counsel replied that she would proceed through proffer. Due to its relevance to this appeal, we will reproduce defense counsel's ensuing remarks in their entirety:

"Your [H]onor, through the course of preparing the case and meeting with [defendant], part of the process what we go through is, do you have any witnesses that you'd like to call, what do you expect them to testify to, those sorts of things. [Defendant] and I had those conversations. And as a part of those conversations, I recall him bringing forth that he had a cousin that was an occurrence witness to this particular event that he would like to call as a witness. He was probably—when he first mentioned his cousin he gave me the cousin's name. He at a subsequent time provided the name Latisha Wilson as a cousin. He did not know her address, so we weren't able to issue a subpoena for her, but he felt friendly with her at that time and felt he could either communicate through family to her to have her present on the court date. I forget if she had a new job or moved or something, but she had no reason she was not able to be here for the court hearing. But in any case, I only recall there being one cousin that he wanted here as an occurrence witness. However, my client asked me about his cousin and he actually indicates that there were two cousins that were occurrence witnesses and there was a Lori Giles *** that was also an occurrence witness. And I think that basically the overlap of those two people, where he didn't have addresses for the same, they had the exact same testimony and those sorts of things; they were interpreted to be the same individual, not two separate individuals based on what he told me they would say, testify to, *et cetera* and whatever information he had on them.

So in any case, my client got to trial not being able to call Latisha Wilson or Lori Giles. I guess basically Latisha, because we didn't have an address and she wasn't subpoenaed to demand her appearance, but Lori Giles, because she was mistakenly communicated between him and I as a to be Latisha Wilson and not a separate individual. For that reason, it got to trial that day and I remember him saying, Well, what about my my other cousin? And I said, What other cousin? And he said[,] [T]he other cousin[.] [A]nd it was after we had already begun the trial and tendered witness lists and it was too late to add somebody by the time this was realized. So, in any case, he had to proceed to trial without calling all available witnesses.

He does believe that if he were able to call Lori Giles and also for that matter, Latisha Wilson, that they would be able to testify to his innocence in this regard. So we'd ask the Court to reconsider the verdict or to set aside the verdict of the jurors on the basis that this was nothing short of just a miscommunication and that it's a miscommunication between him and me that led to him not being able to call all the people that could be put on, the best case to determine whether he in fact was guilty or innocent."

¶ 15 In response, the court pointed out that miscommunication was not a "proper basis" for setting aside a verdict. The court further commented that, based on defense counsel's summary of events, defendant had not provided counsel with enough information to contact

the witnesses. The court concluded: "I was ready, willing and able to find fault with [defense counsel], but it looks like it's an impossibility now." The court denied the motion.

¶ 16    After further hearing, the court sentenced defendant to a term of 4½ years' imprisonment. In its oral pronouncement of the sentence, the court explicitly declared "no fine." On the ensuing written sentencing order, the boxes corresponding to fines, restitution, and costs are each unchecked.

¶ 17    A sheet titled "Case Transactions Summary" appears at the beginning of the record. The sheet was printed and notarized by the circuit clerk on January 22, 2015, 59 days after the filing of the notice of appeal. The sheet lists a number of assessments apparently levied against defendant, totaling a sum of $1020.50. The specific assessments at issue in this appeal will be set forth in the analysis.

¶ 18                                          ANALYSIS

¶ 19    On appeal, defendant raises three arguments, seeking three different remedies. First, defendant seeks a new trial, arguing that defense counsel was constitutionally ineffective for requesting a self-defense instruction where the evidence did not support such a theory. Next, defendant argues that defense counsel proceeded under a conflict of interest when she argued her own ineffectiveness in a posttrial motion. Defendant accordingly requests that the case be remanded for new posttrial proceedings. Finally, defendant argues that a number of the monetary assessments imposed against him were improper and asks that we vacate those assessments.

¶ 20                              I. Self-Defense Instruction

¶ 21    Claims of ineffective assistance of counsel are analyzed under the two-part framework set forth in the seminal case of *Strickland v. Washington*, 466 U.S. 668 (1984). See *People v. Manning*, 241 Ill. 2d 319, 326 (2011). In order to prevail on such a claim, "[a] defendant must show that counsel's performance fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* Moreover, "[t]here is a strong presumption that trial counsel's actions were the result of trial strategy rather than incompetence, and a court of review, therefore, will not second-guess decisions which involve counsel's discretion or strategy." *People v. Humphries*, 257 Ill. App. 3d 1034, 1041 (1994).

¶ 22    Criminal defendants are entitled to have the jury instructed regarding any defense theory, as long as there exists at least slight evidence in support of that theory. *People v. Davis*, 213 Ill. 2d 459, 478 (2004). "It is permissible for such instructions to address alternative theories that are inconsistent so long as each has support in the trial record." *Id.* In the case of a self-defense theory and instruction, that "slight evidence" (internal quotation marks omitted) (*id.*) must necessarily include a defendant's admission to committing the charged act. *People v. Salas*, 2011 IL App (1st) 091880, ¶ 84. Such is the case because "[t]he defense of self-defense presupposes that the accused committed the act and invokes the defense as a justification." *People v. Hawkins*, 88 Ill. App. 3d 178, 182 (1980).

¶ 23    Defendant points to his own trial testimony in arguing that the self-defense instruction was improper. Because he denied committing the necessary act (a battery), defendant argues,

the evidence did not meet the minimal threshold required for the self-defense instruction to be given.

¶ 24    Defendant's argument ignores a fine point in the law on jury instruction. The existing rule requires that a defendant admit to the act; it does not *forbid* defendant from *denying* the act. Such a distinction is relevant in contexts such as that at hand, where a defendant makes conflicting statements—once denying the act, and once admitting to it. Our supreme court has held that " '[a] defendant is entitled to the benefit of any defense shown by the entire evidence, even if the facts on which such defense is based are inconsistent with the defendant's own testimony.' " *People v. Bratcher*, 63 Ill. 2d 534, 540 (1976) (quoting *People v. Scalisi*, 324 Ill. 131, 145 (1926)). More recent appellate court decisions—even in a case relied upon by defendant in this appeal—have held the same. See *People v. Cacini*, 2015 IL App (1st) 130135, ¶ 45 ("A theory of self-defense may properly be raised even if a defendant's own testimony is inconsistent with that theory."); see also *People v. Bailey*, 108 Ill. App. 3d 392, 399 (1982) ("It is recognized that a theory of self-defense or defense of another is properly raised even if the defendant's own testimony is inconsistent with that theory. [Citations.] Thus, where the State presents evidence that a defendant acted in self-defense but the defendant's testimony denied committing the act, the issue is properly raised.").

¶ 25    In the present case, defendant's testimony was that he did not even see Howard on the day in question. However, in speaking with Jordan, defendant claimed that he pushed Howard away from him after she began pushing him. These statements entered the trial record through Jordan's testimony as a part of the State's case-in-chief. Because evidence of defendant's admission to the act in question—in this case, a battery—was introduced, the circuit court properly delivered the self-defense jury instruction upon defense counsel's request. See *Davis*, 213 Ill. 2d at 478.

¶ 26    Our finding that the self-defense instruction was properly given is largely dispositive of defendant's ineffectiveness argument. Counsel could not have been constitutionally deficient for requesting a jury instruction to which defendant was legally entitled. The remainder of defendant's argument, then, is that counsel, having secured that instruction, should have done more to argue the self-defense theory to the jury. But counsel's decision to argue a certain theory in closing arguments is a classic example of trial strategy. *People v. Franklin*, 135 Ill. 2d 78, 119 (1990). This court "will not second-guess decisions which involve counsel's discretion or strategy." *Humphries*, 257 Ill. App. 3d at 1041. We therefore affirm defendant's conviction.

¶ 27                                    II. Conflict of Interest

¶ 28    Defendant next argues that counsel proceeded under a conflict of interest when she argued her own ineffectiveness in a posttrial motion. Defendant contends that an attorney arguing his or her own ineffectiveness is a *per se* conflict of interest; alternatively, defendant contends that the record shows counsel nevertheless had an actual conflict of interest. He argues that the matter should be remanded for new posttrial proceedings.

¶ 29    We note that defendant also argues he is entitled to relief on this issue under a *Krankel*-based theory. Specifically, defendant argues: "the trial court erred in failing to appoint new counsel under *People v. Krankel*, 102 Ill. 2d 181 (1984), in order to present [defendant's] claim, originally raised *pro se*, that defense counsel provided ineffective

assistance of counsel." However, defendant concedes that the present situation does not fall squarely within the ambit of *Krankel*, admitting that his *pro se* letter "was probably not enough to trigger a *Krankel* hearing." Moreover, defendant admits that he was "not technically *pro se*" at the time the ineffectiveness claim was fully raised before the circuit court. We agree that this case does not fit neatly within the *Krankel* framework. Because we find relief warranted under defendant's conflict of interest theory, however, we need not address his *Krankel* argument.

¶ 30    A defendant's constitutional right to effective assistance of counsel includes the right to conflict-free representation. *People v. Hernandez*, 231 Ill. 2d 134, 142 (2008). There are two types of conflicts of interest: *per se* conflicts and actual conflicts. A *per se* conflict exists where certain facts about a defense attorney's status alone present a disabling conflict. *Id.* Where a *per se* conflict exists, a defendant is not required to demonstrate any prejudice flowing from the conflict. *Id.* at 143. "If a *per se* conflict does not exist, a defendant may still establish a violation of his right to effective assistance of counsel by showing an actual conflict of interest that adversely affected his counsel's performance." *Id.* at 144. In order to prevail on a claim of actual conflict of interest, a defendant "must show 'some specific defect in his counsel's strategy, tactics, or decision making attributable to [a] conflict.' " *People v. Morales*, 209 Ill. 2d 340, 349 (2004) (quoting *People v. Speitzer*, 123 Ill. 2d 1, 18 (1988)).

¶ 31    Defendant argues first that a *per se* conflict of interest exists where defense counsel argues his or her own ineffectiveness. In *Hernandez*, our supreme court identified three contexts in which a *per se* conflict exists, none of which included the present situation. *Hernandez*, 231 Ill. 2d at 143-44. Appellate court decisions are split as to whether defense counsel's allegation of his or her own ineffectiveness constitutes a *per se* conflict. Compare *People v. Perkins*, 408 Ill. App. 3d 752, 762 (2011), and *People v. Taylor*, 146 Ill. App. 3d 45, 52-53 (1986) (rejecting *per se* conflict), with *People v. Keener*, 275 Ill. App. 3d 1, 5 (1995) ("A *per se* conflict of interest arises when attorneys argue motions in which they allege their own ineffectiveness."). Because the facts of this case demonstrate an *actual* conflict of interest, we need not decide whether an attorney's allegation of his or her own ineffectiveness constitutes a *per se* conflict.

¶ 32    Defense counsel's motion to set aside the verdict in the present case was premised on a single issue: her own ineffectiveness in calling defendant's witnesses. In order to prevail on this motion then, counsel was obligated to show (1) that her performance was constitutionally deficient and (2) that but for that deficient performance, a reasonable likelihood existed that the result of the trial would have been different. *Manning*, 241 Ill. 2d at 326. Defense counsel's performance may be deficient where she fails to call known witnesses whose testimony may exonerate the defendant. *People v. Coleman*, 183 Ill. 2d 366, 398 (1998). In order to establish prejudice in such situations, a defendant must present affidavits establishing the testimony that those witnesses would have provided. *People v. Enis*, 194 Ill. 2d 361, 380 (2000). Without such affidavits, there is no way of knowing whether that testimony would have impacted the outcome of the proceeding. *Id.*

¶ 33    Defense counsel failed to make any reasonable effort with respect to either prong of the *Strickland* standard. Rather than arguing that her performance had been deficient for failing to investigate and track down Wilson and Giles, she placed the blame on defendant and a "miscommunication." Ultimately, it was this characterization that led the court to deny the motion. More importantly, counsel failed to provide affidavits concerning the expected

testimony of Wilson and Giles. Indeed, counsel failed to describe in any significant way what their testimony would have been. Absent such evidence, the motion to set aside the verdict was fatally flawed, as counsel could not possibly have demonstrated prejudice. We find that these clear and obvious defects in counsel's performance were attributable to the conflict of interest inherent in arguing her own ineffectiveness. *Morales*, 209 Ill. 2d at 348-49.

¶ 34    To be clear, we express no opinion regarding the merits of the claim that defense counsel was ineffective for failing to call Wilson and Giles as witnesses. Defense counsel was certainly under no obligation to raise that argument in a posttrial motion. See, *e.g.*, *People v. Easley*, 192 Ill. 2d 307, 329 (2000) ("[I]t is not incompetence of counsel to refrain from raising issues which, in his or her judgment, are without merit, unless counsel's appraisal of the merits is patently wrong."). However, once counsel *did* choose to raise the issue of her own ineffectiveness, she had a duty to zealously represent her client in that proceeding. While we do not foreclose the possibility that a defense attorney may zealously and competently argue his or own ineffectiveness, counsel in the present case failed to do so. Accordingly, we vacate the circuit court's denial of defendant's posttrial motion and remand the matter for the appointment of conflict-free counsel, who may include whatever issues he or she deems meritorious in a new posttrial motion.

¶ 35                                III. Fines and Fees

¶ 36    Finally, defendant takes exception to a number of monetary assessments imposed upon him following his conviction. He first argues that the circuit clerk imposed 11 fines totaling $660, despite not having the authority to do so. Defendant also argues that three fees, totaling $116.50, were imposed by the circuit clerk without statutory authority. Defendant requests that this court thus vacate $776.50 from his total assessments.

¶ 37                                     A. Fines

¶ 38    It is well settled that the imposition of a fine is a judicial act. *E.g.*, *People v. Wade*, 2016 IL App (3d) 150417, ¶ 10. As such, a circuit clerk does not have the authority to impose fines, and any fines imposed by the clerk are void from their inception. *Id.* Fines imposed without authority by circuit clerks must therefore be vacated. *Id.* ¶¶ 9, 13.

¶ 39    The 11 assessments that defendant alleges to be fines are: "State Police Operation Assistance Fund" ($15), "Surcharge - Lump Sum" ($25), "Domestic Violence" ($200), "Sexual assault Fine" ($200 total), "Violent Crime Victims Assistance Fund" ($100), "Court usage" ($50), "Criminal Child Advocacy Center" ($30), "Drug Court Fund" ($5 total), "Drug Court Operation" ($10), "Medical Costs Fund" ($10), and "State Police Merit Board" ($15 total). These assessments total $660.

¶ 40    This court has found each of the above listed assessments to be fines. *People v. Johnson*, 2015 IL App (3d) 140364 (appendix). Indeed, the State does not argue otherwise, nor does it argue that the circuit clerk had any authority to impose the fines. The circuit court in the present case stated explicitly that no fines would be imposed. Thus, any fines assessed were necessarily imposed by the circuit clerk, who did not have the authority to do so.

Accordingly, we vacate the $660 in fines imposed.[1]

¶ 41                                          B. Fees

¶ 42    Defendant has also identified three fees which he alleges were imposed by the circuit clerk without statutory authority. Those three fees are the State's Attorney costs fee ($80), the State's Attorney service ($51.50), and criminal court appearance fee ($15).[2]

¶ 43    The statute authorizing the circuit clerk to assess fees to offset State's Attorney costs authorizes a $30 fee for the prosecution of all "cases punishable by imprisonment in the penitentiary." 55 ILCS 5/4-2002(a) (West 2014). It also authorizes a fee of $25 for each day of trial. *Id.* Given the two-day trial in this case, the $80 imposed was likely a product of those assessments. However, the $25-*per-diem* fee is only authorized where the circuit court enters an order "specifying the number of days for which said per diem shall be allowed." *Id.* No such order was entered here. Thus, $50 of the $80 State's Attorney costs fee must be vacated. See *People v. Burney*, 2011 IL App (4th) 100343, ¶ 101 (fee imposed without proper statutory authority is void *ab initio*).

¶ 44    Defendant contends that there simply is no statutory authorization supporting the State's Attorney service assessment. This court cannot find any such authorization, nor, apparently, can the State. Absent any statutory authority, we are unable to determine whether the assessment is a fine or a fee. In any event, the assessment must be void. If it is a fine, it was imposed without authority. If it is a fee, there is no clear statutory authority that would support its imposition. The assessment of $51.50 must therefore be vacated. *Id.*

¶ 45    Finally, defendant points out that the criminal court appearance fee may only be assessed "when the violation complaint is issued by a municipal police department." 705 ILCS 105/27.1a(w)(2) (West 2014). The charges in the instant case were commenced via indictment, rather than a "violation complaint." Accordingly, we agree with defendant that this assessment was not statutorily authorized and that the $15 fee must be vacated.

¶ 46    In summary, the circuit clerk imposed $660 in fines, which must now be vacated, as the clerk did not have the authority to impose any fines.[3] The clerk also imposed $116.50 in fees that lacked the proper statutory authority, which must also be vacated. In sum, we vacate a total of $776.50 from defendant's total monetary assessments.

---

[1]We note that the State's only argument regarding this issue concerns this court's jurisdiction. Specifically, the State argues that the notice of appeal in this case does not encompass the monetary assessments, as those assessments were apparently imposed months after the notice of appeal was filed. It also argues that no "order" exists that this court may review. Each of these arguments has been explicitly rejected by our supreme court. *People v. Gutierrez*, 2012 IL 111590, ¶¶ 7-14.

[2]Defendant also argues that the criminal court appearance fee is actually a fine. Because we find that that assessment was unauthorized whether a fee or fine, we need not decide here which label that assessment falls under.

[3]Following our supreme court's decision in *People v. Castleberry*, 2015 IL 116916, ¶ 26, we may not remand the matter for the proper imposition of any fines. *Wade*, 2016 IL App (3d) 150417, ¶ 16.

¶ 47

¶ 48 The judgment of the circuit court of Peoria County is affirmed in part, vacated in part, and remanded with directions.

¶ 49 Affirmed in part and vacated in part; cause remanded with directions.

¶ 50 JUSTICE WRIGHT, concurring in part and dissenting in part.

¶ 51 I agree the trial court did not incorporate any punitive amount into the written sentencing order. Further, I observe the written judgment order found at pages C79-80 of the record on appeal is decidedly silent regarding court costs. In addition, the court order does not include any language reducing the amount of unaddressed and undetermined court costs to judgment. However, without taking any position with respect to the correct amount of the unpaid balance due, if any, I respectfully contend the monetary issue is not ripe for our review.

¶ 52 At this time, the clerical data entries have been ignored such that a conflict with the controlling court order does not exist at this time. In other words, no one has attempted to enforce the erroneous clerical balance due. Defendant has not been subject to any imposed pay date or demand for payment. Defendant does not assert he is prepared to pay the amount of $244, which represents those assessments he does not challenge on appeal. Since defendant is currently represented by the office of the State Appellate Defender, I presume this defendant remains indigent. To date the correct amount for the unpaid balance of allowable costs remains undetermined but is irrelevant until such time as defendant is prepared to voluntarily pay the $244 he concedes as allowable costs or some additional amount that a subsequent court order compels defendant to pay in the future.

¶ 53 We are engaging in a lengthy but abstract discussion of the correct amount of an unpaid balance due that defendant may never be able to pay or asked to do so by the court. I respectfully observe that this court should focus on whether the monetary issue is ripe for our review at this time because courts must " 'decide actual controversies and not abstract questions.' " *Lebron v. Gottlieb Memorial Hospital*, 237 Ill. 2d 217, 252 (2010) (quoting *People v. $1,124,905 U.S. Currency & One 1988 Chevrolet Astro Van*, 177 Ill. 2d 314, 328 (1997)). "[I]f the harm that a [party] claims is merely speculative or contingent, the claim is unripe and a court should not decide it." *Smart Growth Sugar Grove, LLC v. Village of Sugar Grove*, 375 Ill. App. 3d 780, 789 (2007).

¶ 54 Though the concept of an "actual controversy" escapes easy definition, the United States Supreme Court described the concept as follows:

> "A 'controversy' in this sense must be one that is appropriate for judicial determination. [Citation.] A justiciable controversy is thus distinguished from a difference or dispute of a hypothetical or abstract character; from one that is academic or moot. [Citation.] The controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests. [Citations.] It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Aetna Life Insurance Co. v. Haworth*, 300 U.S. 227, 240-41 (1937).

¶ 55    Certainly, we can speculate that defendant may be harmed in the future *if* the prosecution attempts to secure a subsequent court order compelling this defendant to pay more than the unchallenged first $224 of the unpaid balance due. However, at the time of this appeal, it is undisputed this indigent defendant has paid nothing, does not have the ability to pay anything, and has not received a firm date to pay any amount. The issue concerning the correct but unpaid balance of an amount this defendant *cannot* pay at this time is both unripe and nonjusticiable. See *Haworth*, 300 U.S. at 240-41.

¶ 56    I recognize that our supreme court addressed and corrected "void orders of the circuit clerk" in another case. See *People v. Gutierrez*, 2012 IL 111590, ¶ 14. However, *Gutierrez* was decided before our supreme court clarified the best approach to ascertain whether a "void" directive from a court proceeding truly exists. See *People v. Castleberry*, 2015 IL 116916. By making this observation, I do not suggest this court has the authority to overrule a judicial decision such as *Gutierrez*. However, *Castleberry* instructs reviewing courts to refocus our attention on whether the appellant has correctly applied the "void" label to any purported directive challenged on appeal. The only directive that exists in this record is the written judgment order that defendant does not challenge on appeal. As of the time of this appeal, no action has been based on the clerical data entries that conflict with the court order.

¶ 57    I agree with the majority's disposition of all other issues. I agree defendant's conviction should be affirmed, but I respectfully disagree that this court should render an opinion on the correct amount of the unpaid monetary balance until this issue becomes ripe *if* defendant suffers some prejudice from any action originating in the trial court to enforce the clerical data entries that conflict with the court order.