2021 IL App (1st) 191089-U

No. 1-19-1089

Order filed August 9, 2021

First Division

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 17 CR 04389 |
| | ) | |
| EDWARD WALLACE, | ) | Honorable |
| | ) | Diane G. Cannon, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE COGHLAN delivered the judgment of the court.
Presiding Justice Walker and Justice Hyman concurred in the judgment.

**ORDER**

¶ 1     *Held*:  We affirm defendant's conviction over his contentions that the trial court erred in (1) denying his request for a self-defense jury instruction and (2) imposing consecutive sentences.

¶ 2     After a jury trial, defendant Edward Wallace was convicted of aggravated domestic battery based on great bodily harm (720 ILCS 5/12-3.3(a) (West 2016)) and aggravated domestic battery involving strangulation (720 ILCS 5/12-3.3(a-5) (West 2016)). He was sentenced to consecutive

terms of seven and three years' imprisonment. On appeal, he contends that the trial court abused its discretion in declining his request for a jury instruction on self-defense. Alternatively, he contends that the trial court abused its discretion in imposing consecutive sentences. For the following reasons, we affirm.

¶ 3    Defendant proceeded to trial on two counts of aggravated domestic battery: count I was premised on defendant striking Jacinth Jacobs with a baseball bat, and count II alleged that he strangled Jacobs. Before trial, the State moved to admit proof of other crimes, relating to incidents of domestic violence by defendant against Jacobs in February 2014 and December 2015. Following a hearing, the court ruled that it would permit evidence regarding the December 2015 incident but not the February 2014 incident.

¶ 4    At trial, Jacobs testified that she had a nine-year relationship with defendant, who is the father of three of her four children. Jacobs's dating relationship with defendant ended in late 2015, but defendant continued to see the children once or twice a week.

¶ 5    On the evening of February 22, 2017, Jacobs was at her residence, where she lived with her children. Her brother, Derrick Jacobs (Derrick), lived in the basement of the same residence.

¶ 6    Defendant was visiting the children that evening because he was moving out of state. Jacobs picked defendant up and they returned to her home around 9:00 p.m. Jacobs remained in her bedroom while defendant spent time with the children. After the children went to bed, defendant left to visit his friend, who lived next door. When he returned at approximately 11:30 p.m., he entered Jacobs's bedroom, insisting he "wanted to talk about us and get things straight."

¶ 7    Jacobs repeatedly asked defendant to leave her bedroom, but he struck her face, knocking her onto the bed. Defendant then "got on top of [her], so his leg[s] were straddled" on either side. He struck her with a closed fist on both sides of her face and choked her by putting his hands on

her neck, making it extremely hard for her to breathe. She was "gasping for air and trying to yell and scream."

¶ 8    Jacobs attempted to fight defendant off and "flail[ed] [her] arms at him." At one point, he caught her left hand in his mouth and bit down on it, causing throbbing and bleeding. Defendant eventually got up off the bed, but began "blocking the exit towards the door." Jacobs grabbed a metal bat that she kept near her bed and tried to hit him. As she attempted to swing the bat, defendant grabbed it from her. Defendant struck her five or six times with the bat in the forehead, the right side of her head and her "arm area, from like the elbow to the wrist," causing bleeding on her forehead and the back of her head.

¶ 9    Jacobs kept kicking her legs and defendant finally fell backwards. She then ran downstairs to the basement and woke Derrick, who ran upstairs. Derrick and defendant began "tussling" and pushing each other on the stairs. They fell downstairs, continuing to struggle as they made their way to the front room. Jacobs grabbed a lamp and hit defendant in the legs. She also pressed a panic button to activate an alarm system in her home and called 911. "There was blood everywhere" when the police arrived. Jacobs had blood in her hair, on her face and down her chest and legs. She was taken to the hospital and treated for a fractured left arm that required a cast and received stitches on the right side of her forehead.

¶ 10    With respect to the December 26, 2015 domestic violence incident,[1] Jacobs testified that she was sitting in the front room of her home when defendant "came over to the other side of the room *** and struck [her] in the face" with a closed fist while she was holding the baby. Defendant "proceeded to stomp on [her] with his feet." They continued arguing and he "came towards [her]

_____

[1] The judge instructed the jury that the prior domestic violence evidence could only be considered on the issues of defendant's motive, intent, lack of mistake and continued hostility.

again, one of [her] sons was right there, and he pushed him, and so [she] pushed [defendant]" and ran towards the basement. Defendant kicked Jacobs down the basement stairs and "began to choke [her] at the bottom of the stairs." Jacobs sustained scrapes and scratches on the back of her arm, and a scrape on her right thigh. When defendant began apologizing to her, she ran out the back door and called the police.

¶ 11    Derrick testified that on the night of the instant offense, he was in the basement sleeping when was awakened by Jacobs, who had a bloody face and was screaming that defendant was trying to kill her. Derrick ran upstairs from the basement and defendant struck him in the face with a bat. As they struggled over the bat on the main level of the house, Derrick managed to toss the bat away and restrain defendant from leaving until the police arrived. At some point, Derrick told Jacobs to hit defendant. His eye was swollen and bloody from being struck with the bat by defendant.

¶ 12    Chicago police officer Brian Bratton testified that he went to the residence in response to a radio call shortly after midnight. Jacobs, who was "covered in blood," answered the door. Bratton observed Derrick "on top of [defendant] laying on the ground." Jacobs was "hysterical," telling Bratton that she had been beaten with a baseball bat. Bratton was "concerned for [Jacobs's] health" and called an ambulance.

¶ 13    Keith Connolly, an evidence technician with the Chicago Police Department, did not notice any injuries to defendant when he took photographs of him at the police station.

¶ 14    Dr. Yalaunda Thomas, a surgeon at Advocate Christ Medical Center, treated Jacobs in the early morning hours of February 23, 2017. Jacobs received stitches on her forehead and a splint for a fractured ulnar styloid in the forearm. The fracture was consistent with being struck with a steel bat.

¶ 15   Defendant testified that he was 32 years old and that Jacobs was the mother of his three boys. At about 9:30 p.m. on the night of the incident, he went with a friend to get some food after helping put the children to bed. He returned at about 11:45 p.m. and went into Jacobs' bedroom to give her some food.

¶ 16   When defendant told Jacobs that he was going out again, she started arguing with him, asking him if he was texting with another woman. Defendant ignored Jacobs, and she got upset. According to defendant, "[s]he grabbed a bat and she knocked - - she hit me in my wrist knocking my phone and the bag of food out of my hands." Defendant was shocked by the blow and saw that Jacobs was "about to swing the bat at [him] again, so [he] blocked it." Jacobs then "jumped down off the bed and she threw the bat at [him] and ran out the [bedroom] door."

¶ 17   After Jacobs left, defendant "went to [his] kids' room to get [his] stuff" and decided to have a friend drive him home. He saw Jacobs and Derrick downstairs and said he was leaving. Derrick got upset and "swung at" him. Defendant "swung back" and asked Derrick to just let him leave. Derrick stopped defendant from leaving by grabbing him, and they continued fighting. Jacobs was "right behind" Derrick during the fight. Defendant was on the floor and Derrick was on top of him when the police arrived.

¶ 18   Defendant clarified that Jacobs ran upstairs and came back down with the bat while he was fighting with Derrick. He denied hitting "anyone with the bat that night" or biting Jacobs.

¶ 19   During the fight with Derrick, Jacobs hit defendant with the bat, after which he tried to "yank the bat out of her hand but [he] only [had] her hands." Derrick "grabbed [him] again around the neck. So when [he] fell back, [defendant] let the bat go." Jacobs hit him with the lamp and a "few things" and Jacobs was "whacking" him with the bat when the police arrived.

¶ 20    Regarding the incident of December 26, 2015, defendant recalled arguing with Jacobs after she refused to drive him home, but denied that he punched, pushed or kicked her, or that he pushed any of the children. He stated that Jacobs slapped him "so [he] grabbed her hands and she kicked [him]," after which she ran out the back door. Later that day, he was confronted and chased by Derrick, Jacobs, and Derrick's girlfriend. Defendant stopped a police car for help but was handcuffed after a report came over the police radio about a domestic dispute. He pled guilty to simple battery because he "just wanted to get done with the case."

¶ 21    Regarding the instant offense, defendant stated that Jacobs picked up the bat and attacked him, striking him once on his right forearm. After she struck him, he stumbled back, tripped, and fell. When Jacobs saw him get back up, she threw the bat and ran downstairs. When he came downstairs, Derrick punched him several times. Meanwhile, Jacobs ran back upstairs and retrieved the bat. Defendant denied that he ever hit Jacobs with the bat, stating that he was "trying to pull her hands apart for her to drop the bat." He could not recall when Jacobs started bleeding. Defendant acknowledged telling police that, as he was grabbing for the bat, Jacobs "was swinging it back and forth hitting herself."

¶ 22    In rebuttal, the State called Detective Douglas Szymanski, who testified that he spoke with defendant at approximately 1:13 a.m. on February 23, 2017. Defendant related that Jacobs pushed him following an argument, and then Jacobs followed defendant downstairs with a baseball bat. Later that day, defendant told Szymanski and an Assistant State's Attorney that he had slipped on a child's toy and fallen onto Jacobs in her bed. Jacobs was "holding the bat in the middle swinging it back and forth as the defendant was straddled on top of her."

¶ 23    At the conclusion of the evidence, defense counsel requested jury instructions on self-defense. The trial court ruled that defendant was not entitled to a self-defense instruction because "he chose to [testify] he never struck anyone."

¶ 24    The jury found defendant guilty of aggravated domestic battery causing great bodily harm and aggravated domestic battery based on strangulation. Defendant filed a "motion for a judgment of acquittal notwithstanding the verdict and/or or, new trial," which was denied.

¶ 25    Defendant's presentence investigation (PSI) report reflected that he dropped out of high school but obtained his GED in 2010. From 2015 until 2017 he worked at a McDonald's restaurant. In addition to his conviction for the December 2015 domestic battery against Jacobs, defendant's criminal history included convictions for child abuse, bail jumping and disorderly conduct.

¶ 26    At the sentencing hearing, Jacobs read a victim impact statement describing the February 2017 incident as one of the "most terrifying" events of her life. She stated that she could have been killed and was "haunted" by the memory of what happened, that her arm fracture "will likely never heal" and that the "lump in [her] head where he repeatedly struck [her] with a bat will never go away." She also indicated that defendant's actions caused her children "immense pain" and that her oldest son's behavior has changed dramatically "due to the awareness of domestic violence occurring at the hands of his father." She asked the court to consider her safety and that of her children in imposing sentence.

¶ 27    Defense counsel asked for "the minimum sentence." He argued that defendant had attempted to improve himself while in custody by participating in weekly "clinical therapy groups," completing mentorship and leadership programs, attending a barber's college and joining a "Fatherhood in Action" program. Counsel claimed that defendant was actively involved in his children's lives before his arrest and had used his time in custody to improve himself as a father.

¶ 28    In allocution, defendant stated that his "right to self-defense ha[d] been violated." He maintained the evidence showed that he had a reasonable belief that he was in imminent danger and that the "claimed victim admitted to being the aggressor." He accused the court of "bias" and the victim of "character assassination," stating that "sympathy is not a law." He expressed his desire to resume being involved in his children's lives, claiming he had reflected on his life while in custody and "own[ed] [his] mistakes and faults" as an "imperfect creature." He asked for a minimum sentence and a chance to rejoin his family and society as a "man that attests to the lessons learned from his past."

¶ 29    In imposing its sentence, the court advised:

> "[W]ith regard to your self-defense, not only did you testify under oath that you touched no one in this case, any fight or tussle or contact with the victim's brother who came to her defense in this case occurred after you had, by the evidence, basically attempted to kill her. You broke her arm, you beat her, you strangled her. And then, she finally gets downstairs to wake her brother up to come to her assistance. So, her brother assisting her at that point is not self-defense, sir.
>
> You have been given opportunity after opportunity after opportunity for years, and you pick up felony after felony after felony in this state and in the State of Wisconsin. Your children now are without a father, and they would be without a mother had an uncle not been present in the house * * *.
>
> And you have started to, I guess, ask for help or attend groups since you've been in jail * * *. And, sir, to say that's too little too late would be the understatement of the year. You are a danger to anybody who - - I'm not going to say crosses you, but in your opinion crosses you. And there's a big difference. You

wanted to be, you just said, a good father, be an example. You were not only blowing these children off, you were leaving the state. Their mother tells you to come and say goodbye to these three young men. While these three young men lie in their beds, you strangle, break their mother's arm, and make their house a bloody mess. So you're a danger to them and to everyone who walks the streets."

¶ 30     At that point, defendant interjected that he had "successfully completed" probation in his prior cases, and that those cases were more than ten years old. Defendant also stated:

"Now, as far as me saying I never hit anybody, it was clearly a brawl, two people against one. Okay? Now, as far as what happens in the beginning, nobody knows what happens in the beginning. And the self-defense states that it does not permit a person to pursue and inflict injury upon the initial aggressor who abandons the quarrel, nor does it justify a confrontation with excessive force that one is no longer acting in self-defense but in retaliation. And that was clearly said when I got hit with the lamp if I'm clearly fighting someone else and you grab a weapon and hit me from behind. Okay?

So, as far as the brother defending, it says a person defending another stands in the shoes * * * of the other and may do what is justified in doing to defend himself. So, I mean, I never said I didn't hit anyone. I never said that. I was asked over and over and over, did I hit anyone with a bat, and my response was no. I didn't say that I didn't hit anybody. I didn't say that I didn't defend myself."

¶ 31     After the defendant finished speaking, the court concluded: "Your convictions in this state, the violence exhibited towards the victim in this case, and the protection of society call for consecutive sentencing in this case." The court imposed a seven-year sentence on count I

(aggravated domestic battery causing great bodily harm) and a consecutive three-year sentence on count II (aggravated domestic battery involving strangulation).

¶ 32 Defendant filed a motion for a reduction of sentence, which the court denied, stating:

"[T]he court made determination of your danger to yourself, your danger to others and for the protection of society, I made findings for consecutive sentencing. Due to your background, your criminal history, your social history, [the] Court took everything into account, sir. I do not believe due to your background, the facts of the case as the Court heard alongside the jury that the sentence of ten years was excessive."

¶ 33 On appeal, defendant first contends that the trial court abused its discretion in denying his request to instruct the jury on self-defense. "A defendant in a criminal case is entitled to have the jury instructed on any legally recognized defense theory which has some foundation in the evidence, however tenuous. [Internal quotation marks omitted.]" *People v. Lewis*, 2015 IL App (1st) 122411, ¶ 56. However, "an instruction should not be given without evidence to support it. [Internal quotation marks omitted.]" *Id.*

¶ 34 "A criminal defendant is entitled to a jury instruction on self-defense if 'very slight' or 'some' evidence exists to support the theory of self-defense." *Id.* (quoting *People v. Everette*, 141 Ill. 2d 147, 156, 157 (1990)). In order to instruct the jury on self-defense, the defendant must establish some evidence of each of the following elements: " '(1) force is threatened against a person; (2) the person threatened is not the aggressor; (3) the danger of harm was imminent; (4) the threatened force was unlawful; (5) he actually and subjectively believed a danger existed which required the use of the force applied; and (6) his beliefs were objectively reasonable.' " *Lewis*, 2015 IL App (1st) 122411, ¶ 56 (quoting *People v. Jeffries*, 164 Ill. 2d 104, 127-28 (1995)).

"[W]hen the trial court, after reviewing all the evidence, determines that there is insufficient evidence to justify the giving of a jury instruction, the proper standard of review of that decision is abuse of discretion." *People v. McDonald*, 2016 IL 118882, ¶ 42.

¶ 35    Defendant argues that the trial court abused its discretion because there was some evidence that he acted in self-defense. Although he denied striking anyone with the bat, "he did not deny participating in a physical fight." In addition, while he and Derrick were fighting, Jacobs joined in, and he attempted to "yank" the bat from Jacobs and "pull her hands apart for her to drop the bat." According to defendant, his testimony describing a "physical fight between him, Jacobs, and Derrick" was enough evidence to meet the low threshold for a self-defense instruction.

¶ 36    This court has previously explained:

> "Self-defense is an affirmative defense [citation] and 'the raising of such a defense necessarily constitutes an admission by the defendant that he committed the crime for which he is being prosecuted' (*People v. Raess*, 146 Ill. App. 3d 384, 391 (1986)). Because self-defense presupposes the intentional use of force in defense of one's person, no instruction of self-defense is applicable to an act that a defendant denies committing. [Citation.]" *People v. Cacini*, 2015 IL App (1st) 130135, ¶ 44.

Stated differently, although only slight evidence of self-defense is required to support a self-defense jury instruction, that slight evidence "must necessarily include a defendant's admission to committing the charged act." *People v. Brown*, 2017 IL App (3d) 140921, ¶ 22 (citing *People v. Salas*, 2011 IL App (1st) 091880, ¶ 84). "Such is the case because '[t]he defense of self-defense presupposes that the accused committed the act and invokes the defense as a justification.' "

*Brown*, 2017 IL App (3d) 140921, ¶ 22 (quoting *People v. Hawkins*, 88 Ill. App. 3d 178, 182 (1980)).

¶ 37    In *Brown*, our Third District further specified, as a "fine point in the law on jury instruction," that "[t]he existing rule requires that defendant admit to the act; it does not *forbid* defendant from *denying* the act." (Emphasis in original.) 2017 IL App (3d) 140921, ¶ 24. Thus, even if a defendant denies the charged act at trial, the self-defense instruction may still be given if a "defendant makes conflicting statements—once denying the act, and once admitting to it," *id.*, or if defendant's admission to the act was introduced in the State's evidence. See *id.* ¶ 25 (in battery case, holding that court properly gave self-defense instruction where a State's witness testified that defendant admitted to the act, notwithstanding defendant's trial testimony denying the act).

¶ 38    We recognize that a self-defense instruction may be warranted even if the evidence is inconsistent. See, *e.g.*, *Everette*, 141 Ill. 2d at 156-57 (although defendant in homicide case testified he accidentally killed the victim, defendant was still entitled to an instruction on self-defense where there was some evidence in the record which, if believed by a jury, would support the defense). Nonetheless, there must be some evidence that defendant admitted to the charged act. See *Brown*, 2017 IL App (3d) 140921, ¶ 22 (evidence to support self-defense instruction "must necessarily include a defendant's admission to committing the charged act"); *Cacini*, 2015 IL App (1st) 130135, ¶ 44 (raising of self-defense "necessarily constitutes an admission by the defendant that he committed the crime for which he is being prosecuted"); see also *Lewis*, 2015 IL App (1st) 122411, ¶¶ 62-64 (self-defense instruction not warranted where defendant did not testify and "thus never admitted firing his weapon at" murder victim and the defense witnesses testified that a third party fired the fatal shots).

¶ 39    In this case, although defendant described struggling with Jacobs for control of the bat and fighting with Derrick, there was no evidence presented at trial (in defendant's testimony or otherwise) that defendant ever admitted to the charged acts, *i.e.*, striking Jacobs with a bat (count I) or strangling her (count II). Therefore, the trial court did not abuse its discretion in declining to give a self-defense instruction.

¶ 40    Based on *People v. Cacini*, 2015 IL App (1st) 130135, defendant maintains that his testimony regarding a physical struggle with Jacobs was enough to warrant a self-defense instruction. In *Cacini*, there was evidence, albeit slight, that defendant admitted committing the charged acts of using force against police officers. Here, defendant never admitted the charged acts of striking Jacobs with a bat or strangling her.

¶ 41    Defendant also claims that the trial court abused its discretion in imposing consecutive sentences, which "were not necessary in order to safeguard the public." Emphasizing his "fraught and contentious relationship" with Jacobs, he argues that concurrent sentences are warranted because his conduct "did not pose a significant threat to society in general."

¶ 42    As a threshold matter, the State contends that defendant's sentencing argument is forfeited, because defense counsel did not object when the sentence was imposed, and no written motion to reconsider the sentence is included in the record on appeal. See *People v. Hillier*, 237 Ill. 2d 539, 545 (2010) (to preserve a claim of sentencing error, both a contemporaneous objection and a written postsentencing motion raising the issue are required).

¶ 43    Defendant disputes forfeiture. He acknowledges that the written motion to reconsider is not in the record, but argues that "it is indisputable that a motion to reconsider the sentence was in fact filed, and it is not 'unclear' what was counsel's basis for filling the motion." In the alternative, defendant seeks review under the plain-error doctrine, which "allows a reviewing court to consider

unpreserved claims of error in specific circumstances." *People v. Thompson*, 238 Ill. 2d 598, 613 (2010).

¶ 44    To establish plain error, "a defendant must first show that a clear or obvious error occurred. [Citation.] In the sentencing context, a defendant must then show either that (1) the evidence at the sentencing hearing was closely balanced, or (2) the error was so egregious as to deny the defendant a fair sentencing hearing. [Citation.]" *Hillier*, 237 Ill. 2d at 545. Defendant argues that the first prong applies because the "evidence concerning whether discretionary consecutive sentences were necessary was closely balanced."

¶ 45    The "first step of plain-error review is determining whether any error occurred." *Thompson*, 238 Ill. 2d at 613. Section 5-8-4 of the Unified Code of Corrections provides that, when a court imposes multiple sentences of imprisonment on a defendant at the same time, "the sentences shall run concurrently unless otherwise determined by the Illinois court under this section." 730 ILCS 5/5-8-4(a) (West 2016). The Code authorizes the imposition of consecutive sentences "if, having regard to the nature and circumstances of the offense and the history and character of the defendant, it is the opinion of the court that consecutive sentences are required to protect the public from further criminal conduct by the defendant, the basis for which the court shall set forth in the record." 730 ILCS 5/5-8-4(c)(1) (West 2016). Discretionary consecutive sentences "should be imposed sparingly." *People v. Buckner*, 2013 IL App (2d) 130083, ¶ 35 (citing *People v. King*, 384 Ill. App. 3d 601, 613 (2008)). "Consecutive sentences should be imposed in exceptional cases, and the record must show that the trial court has adequately balanced mitigating factors and rehabilitative potential against the need to protect the public. [Citations.]" *People v. Phagan*, 2019 IL App (1st) 153031, ¶ 116.

¶ 46    "Because the trial court is in the best position to consider a defendant's credibility, demeanor, general moral character, mentality, social environment, and habits, the trial court's imposition of consecutive sentences will not be reversed on appeal absent an abuse of discretion. [Citation.]" *Buckner*, 2013 IL App (2d) 130083, ¶ 36. "If the record does not reflect that the trial court took mitigating factors into account, including a defendant's potential for rehabilitation, and the record does not support the trial court's determination that consecutive sentences were necessary to protect the public, an abuse of discretion has occurred." *Id.* (citing *People v. O'Neal*, 125 Ill. 2d 291, 298- 301 (1988)). A trial court abuses its discretion when its ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court. *People v. Caffey*, 205 Ill. 2d 52, 89 (2001).

¶ 47    In this case, the trial court did not abuse its discretion in imposing consecutive sentences. The record shows that the court properly weighed defendant's rehabilitative potential, along with other mitigating and aggravating circumstances, in determining that consecutive sentences were warranted to protect the public from defendant's repeated violent behavior.

¶ 48    The record likewise supports the court's finding that defendant's conduct risked harm to others (including children) in the vicinity. Defendant attacked Jacobs in her home with a bat, while her four children were sleeping. He also attacked Derrick when he tried to help his sister. During the prior domestic violence incident, defendant attacked Jacobs in the presence of all of the children while she was holding the baby and pushed one of the other children. In addition, based on defendant's comments at the sentencing hearing—claiming that he acted in self-defense and referring to Jacobs as the "claimed victim"— it was not unreasonable for the court to find that he was likely to repeat his violent conduct.

¶ 49    In arguing that he was not a danger to the public at large, defendant relies on *People v. Carini*, 151 Ill. App. 3d 264 (1986). The defendant in *Carini* was convicted of two counts of concealment of homicidal death after storing two bodies in a rented storage locker. The trial court held that "a consecutive term is necessary to protect the public." *Id*. at 285. Finding an abuse of discretion, we noted that the defendant was only 20 years old and his criminal background was limited to a misdemeanor conviction. *Id.* at 287. We further found that "the conduct involved was neither violent nor of a type otherwise posing a significant threat to society in general or likely to be repeated by defendant in the future." *Id.* In addition to a more extensive criminal history than the defendant in *Carini*, defendant in this case repeatedly attacked Jacobs in the presence of others, including children.

¶ 50    With respect to defendant's argument that Illinois courts "have overturned consecutive sentencing in a wide variety of situations that involved far more serious crimes than those at issue here," when assessing whether a sentence is excessive, we generally do not engage in comparative sentencing. See *People v. Fern*, 189 Ill. 2d 48, 62 (1999) (a "claim that a sentence is excessive must be based on the particular facts and circumstances of that case" and "it will not be a basis for attacking a sentence that a defendant in a separate, unrelated case received a lighter sentence."). Citing *Fern*, the Second District rejected a similar comparative sentencing argument, in the context of a challenge to the imposition of consecutive sentences. *Buckner*, 2013 IL App (2d) 130083, ¶ 43 (rejecting defendant's reliance on "several cases that overturned consecutive sentences involving what she asserts to be 'far more serious crimes than those at issue here' " because a comparative sentencing argument is "not permissible" under *Fern*). In any event, all of the cases cited by defendant for comparison (each of which was decided prior to our supreme court's decision in *Fern*) involve mitigating factors not present in this case.

¶ 51    The record in this case supports the trial court's determination that consecutive sentences were necessary to protect the public and does not reflect an abuse of discretion. *Buckner*, 2013 IL App (2d) 130083, ¶ 36. Similarly, the record does not show that the sentence imposed was arbitrary, fanciful, unreasonable, or that no reasonable person would take the view adopted by the trial court. *Caffey*, 205 Ill. 2d at 89.

¶ 52    As we have rejected defendant's claim of error regarding imposition of consecutive sentences, "we need not go further in the plain error analysis." See *People v. Williams*, 2017 IL App (1st) 150795, ¶ 40.

¶ 53    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 54    Affirmed.